# Exhibit A

**STATE OF MINNESOTA**

**COUNTY OF RAMSEY**

**DISTRICT COURT**

**SECOND JUDICIAL DISTRICT**

---

LINDSEY ROBIDEAU, as Parent and Natural Guardian on behalf of C.R., a Minor

     Plaintiff

v.

FEDERAL CARTRIDGE COMPANY;
THE KINETIC GROUP, INC;
CSG ELEVATE II, INC.;
CSE USA, INC.; and
UNIDENTIFIED ENTITIES 1 THROUGH 10

     Defendants.

Civil Other/Misc.

Case No.

Judge:


**COMPLAINT**

---

### COMPLAINT AND DEMAND FOR TRIAL BY JURY

COMES NOW, Lindsey Robideau ("Plaintiff"), as Parent and Natural Guardian on behalf of C.R., a Minor, by and through her undersigned counsel, hereby files this Complaint against Defendants, FEDERAL CARTRIDGE COMPANY; THE KINETIC GROUP, INC., CSG ELEVATE II, INC.; CSE USA, INC., and UNIDENTIFIED ENTITIES 1 THROUGH 10 (collectively "Defendants"), and alleges, upon information and belief, as follows:

### INTRODUCTION

1.     This action is pursued on behalf of a minor child of a worker at the Federal Cartridge Company, bullet manufacturing facility located at 900 Bob Ehlen Drive, Anoka, MN, 55303 ("Federal Ammunition" or "the Facility" or "Facility" or "Anoka Facility"), who was unwittingly exposed to hazardous substances[1], and as a result, suffered and continues to suffer

---

[1] Whenever the term "hazardous substances" is utilized herein, such term collectively refers to lead, cadmium, arsenic, dioxins, sulfur dioxide and those substances defined as hazardous substances in the Comprehensive Environmental Response, Compensation and Liability Act of 1980. *See* 42 U.S.C.S. § 9601(14).

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM

serious personal injuries due to Defendants' deliberate, intentional, negligent, and/or reckless operation of the Facility.

2. Defendants, despite knowing that workers at the Anoka Facility are being exposed to dangerously high levels of hazardous substances, failed to provide a safe environment, adequate protective equipment, and did not take affirmative steps to avoid hazardous substance dragout from their Facility. Defendants failed to take effective measures to prevent transmission, dissemination, and discharge of hazardous substances from the Anoka Facility to the automobiles and homes of workers resulting in exposure and contamination of Plaintiff's body and home.

3. Defendants, knowing the risks of harm to the family members of those who work with lead materials, did not take the required protective measures to minimize such risks in order to avoid any harm to their workers and workers' family members, including Plaintiff, nor did they inform or educate their workers of the risks involved with carrying hazardous substances home. Also, Defendants did not implement nor enforce hygiene requirements to prevent workers from leaving the workplace with lead dust and fragments and other hazardous substances on their clothes, personal effects and/or person, knowing it could contaminate Plaintiff at his home. As a result, Plaintiff was exposed to and contaminated with high levels of hazardous substances causing physical, emotional, and mental injuries.

4. Defendants exacerbated the hazardous substance exposure and contamination by concealing and misrepresenting its scope, failing to take effective protective measures to protect the workers, failing to prevent exposure and contamination to Plaintiff, as well as failing to take remedial action to eliminate it.

5. This action is brought against Defendants, who were well aware of the health risks and effects from exposure to hazardous substances, including, but not limited to, lead, cadmium, arsenic, dioxins and sulfur dioxide, and which, deriving a direct financial benefit from operating

2

the Facility in the Plaintiff's community, intentionally failed to prevent hazardous substance exposure to Plaintiff.

6.    At the end of their work shift, workers at the Anoka Facility go home to their families not knowing that they carried with them dangerous hazardous substances including, but not limited to lead, lead dust, lead-containing products, cadmiun, arsenic, sulfur dioxide, dioxins and/or other toxic and hazardous substances on and in their clothes, personal belongings, and bodies. As a result, Plaintiff was exposed to dangerous levels of hazardous substances and has suffered the consequences.

7.    This action is brought against Defendants that were well aware of the health risks and effects from exposure to hazardous substances, and which, deriving a direct financial benefit from Plaintiff's family members working at the Defendants' Facility, intentionally failed to provide a safe work environment, adequate protective equipment, and hygiene methods to prevent hazardous substance exposure to the workers and their family members, here Plaintiff.

**PARTIES**

**A. Plaintiff**

8.    At all relevant times hereto, Plaintiff C.R., a minor who resided with a family member that worked at the Anoka Facility and was exposed to hazardous substances while working in the Facility, and who unwittingly carried home such hazardous substances, exposing Plaintiff. As a result, Plaintiff has suffered personal injuries.

**B. Defendants**

9.    Defendant Federal Cartridge Company is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business located in Anoka, MN. Defendant Federal Cartridge Company was and remains an entity engaged in the manufacture of ammunition and related products, which includes activities that cause the release and discharge

3

of hazardous substances from its facilities, including the Anoka Facility located at 900 Bob Ehlen Drive, Anoka, MN, 55303.

10.    Defendant The Kinetic Group, Inc. is a corporation organized and existing under the laws of the State of Delaware, registered to do business in the State of Minnesota as a Foreign Business Corporation, with its principal place of business located at 900 Bob Ehlen Drive, Anoka, MN 55303. Defendant The Kinetic Group, Inc. was and remains an entity engaged in the manufacture of ammunition and related products, which includes activities that cause the release and discharge of hazardous substances from its facilities, including the Anoka Facility located at 900 Bob Ehlen Drive, Anoka, MN 55303.

11.    Defendant CSG Elevate II Inc. is a corporation organized and existing under the laws of the State of Delaware. Defendant CSG Elevate II Inc. was and remains an entity engaged in the acquisition, ownership, and operation of the Anoka Facility, which includes activities that cause the release and discharge of hazardous substances from the Anoka Facility located at 900 Bob Ehlen Drive, Anoka, MN 55303.

12.    Defendant CSE USA, Inc. is a corporation organized and existing under the laws of the State of Delaware. Defendant CSE USA, Inc. was and remains an entity engaged in the acquisition, ownership, and operation of the Anoka Facility, which includes activities that cause the release and discharge of hazardous substances from the Anoka Facility located at 900 Bob Ehlen Drive, Anoka, MN 55303.

13.    Unidentified Entities 1 through 10 are entities whose identities are currently unknown to Plaintiff. Plaintiff has exercised due diligence to ascertain the identities of these defendants but has been unable to do so at this time. Pursuant to Minn. R. Civ. P. 9.08, Plaintiff names these defendants as Unidentified Entities 1 through 10 and will amend this Complaint to substitute the true names of these defendants upon discovering their identities.

4

14.    At all times material hereto, Defendants owned, operated, managed and/or controlled the Anoka Facility located at 900 Bob Ehlen Drive, Anoka, MN 55303 and are therefore directly liable for all the operations at Federal Cartridge Company and the Anoka Facility.

15.    Whenever the term "Defendants" is utilized within this suit, such term collectively refers to and includes all named Defendants in this lawsuit as well as Unidentified Entities 1 through 10.

16.    Whenever the term "Anoka Facility" is utilized within this suit, such term refers to the facility and plant operations located at 900 Bob Ehlen Drive, Anoka, MN, 55303.

## JURISDICTION AND VENUE

17.    Minn. Stat. § 484.01(1) provides that the district courts shall have original jurisdiction over all civil actions within their respective districts.

18.    The events, occurrences, and injuries giving rise to this controversy happened in Anoka, Minnesota, Ramsey County, which are located within the Second Judicial District.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

19.    Defendants own and operate a bullet manufacturing facility located at 900 Bob Ehlen Dr., Anoka, Minnesota, across the road from a densely populated residential community. The Facility is large, with parts of it being in the city of Anoka, MN and other parts of it located in the neighboring city of Coon Rapids, MN. According to the United States Census Bureau, at the 2020 census, Anoka's population was 17,921[2] and Coon Rapid's population was 63,599.[3]

---

[2] United States Census Bureau. Retrieved on March 13, 2026 from:
https://data.census.gov/profile/Anoka_city,_Minnesota?g=160XX00US2701720
[3] United States Census Bureau. Retrieved on March 13, 2026 from:
https://data.census.gov/profile/Coon_Rapids_city,_Minnesota?g=160XX00US2713114

5

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM



Retrieved from Google Maps on March 13, 2026.

20.     Due to the dangerous nature of lead exposure in the Defendants' operations, the Defendants are subject to strict decontamination requirements under 29 CFR 1910.1025 that they must comply with. These regulations are designed to prevent workers from carrying lead contamination out of the workplace and into their homes and communities, thereby protecting both workers' families and the public from secondary lead exposure.

21.     The Defendants are required to provide shower facilities and ensure that employees that are exposed to lead, shower at the end of their work shift and do not leave the workplace wearing any contaminated clothing or equipment, and are not carrying home lead, and other hazardous substances in their shoes, clothing, and belongings.

22.     This action arises from Defendants operating the Anoka Facility in a way that caused Plaintiff to unwittingly be exposed to hazardous substances, foreseeably harming Plaintiff.

6

Defendants allowed dangerously high levels of hazardous substances to escape their Anoka Facility and reach Plaintiff's home, exposing Plaintiff to these hazardous substances.

**Hazardous Substance Exposure Caused by Defendants**

23.     Defendants serve clients such as the U.S. military, law enforcement agencies, and commercial ammunition retailers, generating annual revenues in the hundreds of millions of dollars.

24.     There are hundreds of workers at the Anoka Facility who were exposed to lead and other hazardous substances daily.

25.     The bullet manufacturing process involves the forming, swaging, and finishing of lead-core projectiles, including the handling and processing of raw lead and lead alloys used in the production of ammunition components.

26.     The manufacturing process presents a pathway of exposure to lead from emissions and contamination of workers, their clothing, personal items, and equipment.

27.     Lead particles, dust, and fumes generated during the forming, swaging, trimming, and finishing of lead-core bullets and projectile components are emitted into the air and contaminate workers' bodies, clothing, shoes, personal items such as keys and cell phones, and equipment.

28.     To avoid taking home hazardous substances and to minimize exposure to such substances, federal statutes and regulations required Defendants to implement and maintain effective decontamination processes including mandatory shower facilities, changing rooms with separate contaminated and clean areas, proper cleaning procedures, and rigorous hygiene practices, to prevent workers from leaving the facility with contamination on their persons or belongings, which Defendants failed to do.

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM

29.     Workers at the Anoka Facility became contaminated with lead, lead compounds, copper dust particles, and/or other hazardous substances during their work shifts. When workers left the facility without proper decontamination, they carried these hazardous substances on their clothing, shoes, skin, hair, and personal items such as keys and phones, thereby transporting contamination to their vehicles and ultimately to their homes, where Plaintiff was exposed.

30.     Defendants failed to ensure that employees exposed to airborne hazardous substances showered at the end of their work shifts before leaving the workplace.

31.     Defendants failed to provide adequate change rooms with separate contaminated and clean areas as required by federal regulations.

32.     As a result of these failures, workers routinely left the Anoka Facility contaminated with lead and other hazardous substances on their clothing, shoes, skin, hair, and personal items.

33.     Defendants failed to implement, audit, or verify the effectiveness of any decontamination processes at the Anoka Facility. Defendants did not implement any system to observe, monitor, or evaluate whether workers were actually showering, changing clothes, or leaving contaminated items at the facility before departing for their homes and communities, nor did Defendants take any corrective actions in response to employees' failure to adhere to decontamination requirements.

34.     Defendants failed to implement appropriate measures to ensure that workers did not carry lead and hazardous substances out of the Anoka Facility on their persons, clothing, shoes, or personal items. Despite knowing that workers would, as a result of the failure to implement proper decontamination procedures, carry hazardous substances to their homes, vehicles, and the surrounding community, Defendants failed to take action. Despite knowing that Plaintiff and other individuals in the community would, as a result of this take-home exposure pathway, be exposed

8

to such hazardous substances and would suffer harm from such exposure, Defendants failed to implement the required decontamination processes.

35.    Defendants allowed contaminated workers to leave the Anoka Facility daily, thereby releasing lead and hazardous substances into workers' vehicles, homes, and the surrounding community. This take-home contamination pathway resulted in Plaintiff's exposure to hazardous levels of lead and lead compounds and other hazardous substances that were carried out of the facility by workers who lived with Plaintiff.

36.    Defendants were well aware of the hazards and risks posed by take-home lead and exposure to lead compounds and other hazardous substances.

37.    Defendants knew that workers who were not properly decontaminated before leaving the facility would carry lead and lead compounds on their clothing, shoes, skin, hair, and personal items into their homes. Defendants knew that this take-home contamination would expose Plaintiff and others in the community, yet Defendants did not implement the required decontamination measures to prevent workers from carrying lead and hazardous substances out of the Anoka Facility.

38.    Plaintiff's injuries are a direct and proximate result of exposure to excessive levels of lead, lead compounds, and other hazardous substances due to Defendants' deliberate and intentional failure to implement adequate decontamination processes as required by federal regulations; failure to provide shower facilities and ensure their use; failure to provide adequate change rooms with separate contaminated and clean areas; failure to ensure workers did not leave the facility wearing contaminated clothing or carrying contaminated personal items; failure to audit or verify the effectiveness of any decontamination processes; and failure to prevent the take-home transport of lead and lead compounds from the Anoka Facility to the surrounding community on workers' persons and belongings.

9

**The Defendants' History of Take-Home Lead Exposure**

a.    **Defendants' Lack of Administrative Controls to Prevent the
Escape of Hazardous Substances**

39.    Defendants' failure to implement adequate decontamination measures was not an isolated oversight, but rather part of a documented history of non-compliance with lead safety regulations, as evidenced by publicly reported violations and enforcement actions.

40.    Defendants were aware of the hazards and risks posed by lead, lead compounds, and/or other hazardous substances poisoning.

41.    Defendants failed to implement appropriate measures to ensure that its employees and their household members were not exposed to lead, lead compounds, and other hazardous substances.

42.    Defendants' awareness of the hazards posed by lead and lead compound exposure is further demonstrated by a series of violations cited by the Minnesota Department of Labor and Industry, Occupational Safety and Health Division (MNOSHA) following an inspection of the Anoka Facility conducted between May 7 and August 5, 2021.

43.    The severity of lead contamination at the Anoka Facility is further evidenced by lead wipe surface sampling conducted during the OSHA inspection. As reflected in the image below, surface samples collected on May 18, 2021, revealed alarming levels of lead contamination throughout the Anoka Facility, including in areas where workers eat, change clothes, and store their personal belongings. Notably, the top of lockers where work boots and street shoes were being stored resulted in sample results of 6,600 µg/ft² of lead dust, the changing room floor resulted in sample results of 2,300 µg/ft² of lead dust, and the changing room bench resulted in 1,200 µg/ft² — levels far exceeding what would be expected in a Facility with adequate decontamination, hygiene, and administrative controls in place.

10

## IV.    Findings

### Table 1: Lead Wipe Surface Samples

| Sample No. | Sample Period | Area Samples/Description | Lead Surface Concentration (µg/ft²) |
|---|---|---|---|
| | | **May 18, 2021** | |
| 1001 | 0850 | Break and lunchroom table surface (12"x12" sampled); OSHI S0064's temporary workstation during sampling | 38 |
| 1002 | 1000 | ▓▓▓▓ palms and fingers after washing hands before morning break | 24* |
| 1003 | 1005 | ▓▓▓▓ palms and fingers after washing hands before morning break | 73* |
| 1004 | 1110 | Changing Room; top of lockers (12"x12" sampled) where work boots and street shoes were being stored | 6600 |
| 1005 | 1055 | Changing Room; floor (12"x12" sampled) where both work boots and street shoes were being stored | 2300 |
| 1006 | 1105 | Changing Room; sink counter and two faucet handles | 46* |
| 1007 | 1050 | Changing Room; bench (9"x12" sampled) by locker #14 | 1200 |

* micrograms (µg) of lead reported, unknown area

DLI, MDH_DPR_25-105_000096

44.    Further demonstrating Defendants' knowledge of the hazardous lead exposure levels at the Anoka Facility, OSHA's inspection findings documented that eight of Defendants' employees had been identified with blood lead levels exceeding 25 µg/dl, with one employee exceeding 40 µg/dl — a level requiring mandatory medical intervention under federal regulations. As reflected below, OSHA specifically notified Defendants that it had received reports from the Minnesota Department of Health confirming these elevated blood lead levels among Defendants' workforce.

**Hazard Description:**
MNOSHA receives reports from the Minnesota Department of Health of blood lead levels from employees in Minnesota that exceed 25 ug/dl. MNOSHA has been made aware that eight of your employee's have recently been identified with a blood lead level exceeding 25 ug/dl, with one of those employees exceeding 40 ug/dl.

DLI, MDH_DPR_25-105_000100

11

45.    Among the serious violations cited by MNOSHA was Defendants' failure to provide clean changing rooms for employees exposed to lead. Despite federal regulations explicitly requiring clean changing facilities for workers, Defendants allowed employees to change in contaminated conditions, with no separation between clean and contaminated areas. This failure meant that workers who were already exposed to hazardous levels of lead during their shifts had no means of preventing that contamination from traveling home with them on their clothing, shoes, and personal items.

<u>Citation 01 Item 005</u> Type of Violation:  **Serious**

29 CFR 1910.1025(i)(2)(i):  Clean change rooms were not provided for employees exposed to lead in excess of the permissible exposure limit (PEL), without regard to the use of respirators:

The employer did not provide a clean changing room where one employee was exposed to lead in excess of the 12-hr permissible exposure limit, without regard to the use of a powered-air purifying respirator.

Date By Which Violation Must Be Abated:        9/12/2021
Penalty:                                       $1,750.00

DLI, MDH_DPR_25-105_000133

46.    Compounding this failure, MNOSHA also cited Defendants for failing to equip the changing room with separate storage facilities for protective work clothing and street clothes — a basic but critical safeguard against cross-contamination. By allowing workers' lead-contaminated work clothing and equipment to be stored alongside their street clothes, Defendants ensured that the very clothing workers would wear home to their families was exposed to the same hazardous lead contamination and hazardous substances present on their work gear. This commingling of contaminated and clean clothing created a direct pathway for lead to be transported out of the Anoka Facility and into workers' homes and communities.

12

**Citation 01 Item 006** Type of Violation:    **Serious**

29 CFR 1910.1025(i)(2)(ii):  Change rooms were not equipped with separate storage facilities for protective work clothing and equipment and for street clothes to prevent cross contamination from lead:

The lead plant changing room was not equipped with separate storage facilities for protective clothing and equipment and for street clothes to prevent cross contamination from lead.

**Date By Which Violation Must Be Abated:**        9/12/2021
**Penalty:**                                       $1,750.00

DLI, MDH_DPR_25-105_000134

47.      MNOSHA's inspection of the Anoka Facility further revealed that Defendants failed to implement engineering and work practice controls — including administrative controls — to reduce and maintain employee exposure to lead and other hazardous substances. Rather than investing in the engineering solutions and workplace practices that federal regulations required to minimize workers' lead exposure at the source, Defendants left their employees without the most fundamental protections against lead and hazardous substance contamination.

**Minnesota**
**Department of Labor and Industry**
Occupational Safety and Health Division

| | |
|---|---|
| **Inspection Number:** | 318164985 |
| **Inspection Date(s):** | 05/07/2021 - 08/05/2021 |
| **Issuance Date:** | 08/10/2021 |
| **OSHI ID:** | S0064 |
| **Optional Report No.:** | 00321 |

**Citation and Notification of Penalty**

**Company Name:**  Federal Cartridge Company
**Inspection Site:**   900 Bob Ehlen Drive, Anoka, MN 55303

**Citation 01 Item 002b**                Type of Violation:    **Serious**

29 CFR 1910.1025(e)(1):  Engineering and work practice controls (including administrative controls) were not implemented to reduce and maintain employee exposure to lead in accordance with the schedule in Table I of this paragraph:

DLI, MDH_DPR_25-105_000159

13

48. MNOSHA uncovered that Defendants were primarily using dry sweeping as the means to remove lead from the plant floor — a method known to re-suspend lead particles into the air and increase worker exposure — rather than vacuuming or other more effective methods. MNOSHA further observed dirty change rooms with surface lead contamination, a lack of separate storage facilities for protective clothing and street clothes, and a lack of face washing by employees.

49. Compounding these failures, Defendants' written lead safety program did not specifically address adequate means of cleaning floors and surfaces without dry sweeping, nor did it address the other deficiencies observed by MNOSHA, demonstrating that Defendants' failures were not merely operational but were systemic and ingrained in their written policies and procedures, as reflected below.

> OSHI S0064 noted that the employer had some written information pertaining to a work practice program (part F) in the lead safety program (tiffed to file) including a description of protective work clothing and equipment (page 8; section 10), housekeeping (page 8; section 11), and hygiene facilities and practices. However, OSHI S0064 noted that the employer had several deficiencies in work practices including, but not limited to: primarily using dry sweeping as means to remove lead on the plant floor, dirty change rooms with surface lead contamination, lack of separate storage facilities for protective clothing/equipment and for street clothes to prevent cross contamination from lead, and lack of face washing by employees. The employer's written lead safety program did not specifically address adequate means of cleaning floors and surfaces without dry sweeping. It also did not specifically address

DLI, MDH_DPR_25-105_000202

50. MNOSHA's inspection of the Anoka Facility's changing room further confirmed the deplorable conditions at the Anoka Facility. Despite approximately 30 employees working in the lead plant and being required to use the changing room at the start and end of every shift, MNOSHA inspectors observed that the changing room floors were visibly dirty and that there was no distinction between dirty and clean areas — meaning that workers changing out of their contaminated work clothing had no clean space in which to do so. Rather than maintaining a properly separated changing facility, Defendants provided workers with a visibly contaminated

14

environment, ensuring that the lead contamination they carried on their bodies and clothing throughout their shifts would follow them out of the Anoka Facility and into their homes, as reflected below.

> During the walkaround inspection of the changing room on 5-18-2021, Contact 10 stated that the changing room in the lead plant is cleaned once per day, maybe more, by an outside vendor. Contact 10 stated that cleaning in the changing room includes wiping surfaces and mopping floors. Contact 1 stated that the lead plant changing rooms are cleaned at least daily and the showers are cleaned three times per day. Contact 1 stated that the locker room (i.e. changing room) used to have a clean side and dirty side. Contact 1 stated that the employer has plans to renovate the changing room so there would be a clean side and dirty side to prevent cross contamination. OSHI S0064 noted that the changing room floors were visibly dirty and that there was no distinction between dirty areas and clean areas. Contact 1 stated approximately 30 employees work in the lead plant and are required to use the changing room at the start of the shift to change into their work uniforms and at the end of the shift to shower and change back into their street clothing. Work uniforms are cleaned by the employer daily.

51.     Further demonstrating Defendants' indifference to the hazardous conditions in their own facility, Defendants admitted to MNOSHA that they had no established threshold for what constituted a high or low lead surface concentration level. This admission is particularly damning given the alarming lead surface levels documented throughout the changing room — meaning that even as their workers changed into their street clothes and prepared to return home to their families, Defendants had no system in place to recognize, respond to, or remediate the lead contamination surrounding them, as reflected below.

> Personal lead air exposure monitoring conducted by OSHI S0064 showed ███████ was exposed to a 12-hr time-weighted average of 39 ug/m3 (without regard to use of a PAPR), which is above the 12-hr PEL of 33 ug/m3. OSHI S0064 conducted wipe sampling of various surfaces in the changing room, analyzed with a Niton XL 3T 500 Portable XRF, which showed various surfaces with high lead contamination (see IH report for details). The top of the lockers, where OSHI S0064 noted both work boots and street shoes were being stored, had a lead surface concentration of 6600 ug/ft2. The changing room floor where both work boots and street shoes were also being stored, had a lead surface concentration of 2300 ug/ft2. One of the benches in the changing room had a lead surface concentration of 1200 ug/ft2. The employer's lead safety program (tiffed to this file) states that "Surfaces should be maintained free of lead accumulation" (page 8), but does not specifically address the cleaning of the changing room. Contact 1 stated that the employer has conducted lead surface sampling in the changing room, but the employer does not have a cut off of what is considered high and what is considered low, and that levels are compared to those developed by the U.S. Department of Housing and Urban Development (HUD).

DLI, MDH_DPR_25-105_000208

15

52.    MNOSHA's inspection also revealed a particularly concerning practice at the Anoka Facility: employees were required to change back into their street clothes — the same clothes they would wear home — not only at the end of their shifts, but also before breaks and lunch. This meant that workers were transitioning between their contaminated work environment and their street clothing multiple times throughout the day, each time risking transferring lead contamination onto the clothing they would ultimately carry home to their families. Compounding this risk, some employees – the few that were instructed to shower – were only instructed to shower at the end of their shift, meaning that the lead contamination accumulated on their bodies during the morning and afternoon breaks was carried directly onto their street clothing with no intervening decontamination, as reflected below.

> █████████ Contact 1 stated approximately 30 employees work in the lead plant and are required to use the changing room at the start of the shift to change into their work uniforms. Contact 1 stated employees are required to change back into their street clothes (worn home) before breaks/lunch and at the end of their shift. Contact 1 stated that employees are only required to shower at the end of their shift. Work uniforms are cleaned by the employer daily.

DLI, MDH_DPR_25-105_000211

53.    MNOSHA's review of Defendants' Lead Safety Policy revealed yet another critical gap in Defendants' approach to worker protection. While Defendants' Lead Safety Policy provided for protective clothing and equipment when air lead levels exceeded the permissible exposure limit, it was unclear from both the inspection report and the Lead Safety Policy itself whether protective clothing and clean changing rooms were provided to employees exposed to lead below the permissible exposure limit — meaning that workers throughout other parts of the Facility who were being exposed to lead at any level may have been left without adequate protective gear or clean changing facilities. This gap is particularly significant given the well-established science that there is no safe level of lead exposure, and that even sub-threshold lead exposure can result in serious and irreversible harm, as reflected below.

16

> operations are located within the lead foundry. The Lead Safety Policy states that work clothing such as coveralls, gloves, hats, shoes, shoe covers, face shields, goggles, and other appropriate clothing will be provided when air lead levels exceed the permissible exposure limit. It is unclear from the inspection report and Lead Safety Policy whether protective clothing and clean changing rooms are provided to employees who may be exposed to lead below the permissible exposure limit in air, for the purposes of reducing lead tracked home from other parts of the lead plant.

DLI, MDH_DPR_25-105_000308

54.     Defendants' admitted that they had not been provided employees with dedicated work shoes prior to MNOSHA's intervention. This means that throughout the period of Defendants' non-compliance, workers were wearing their own personal shoes into the lead plant, accumulating lead contamination on those very shoes throughout their shifts and then walking out of the facility and into their vehicles and homes in those same contaminated shoes. Defendants' belated interest in reimbursing employees for dedicated work shoes following MNOSHA's intervention acknowledges that for many years prior, Defendants had been allowing workers to unknowingly serve as vectors of lead and hazardous substances toxicants into their own homes and communities, as reflected below.

> In addition, we are instituting a policy to reimburse employees for dedicated work shoes in the M.S. § 13.3805 We currently scrub those floors 2-4 times per week, and are ramping this up to 1-2 times per day. We are also installing a HEPA vacuum mechanized shoe scrubber

MDH_DPR_25-105_000232, Erik Carlson, Sr. Director of Operations, April 22, 2022

**b.      Defendants' Documented History of Lead Contamination and Community Harm**

55.     Defendants' failure to implement adequate decontamination measures and engineering controls did not merely endanger workers within the Anoka Facility — it resulted in the actual release and escape of lead, lead compounds, and other hazardous substances beyond the Anoka Facility's walls. Lead contamination was carried out of the Facility on workers' bodies, clothing, shoes, and personal items, and was further released into the surrounding community

17

through Defendants' operations, ultimately finding its way into the homes, vehicles, and bodies of workers' family members and community residents, including children.

56.    The consequences of Defendants' failures were both foreseeable and devastating. The Minnesota Department of Health (MDH) detected elevated blood lead levels in children of Defendants' workers — the most vulnerable members of the community — confirming that the take-home exposure pathway created by Defendants' inadequate decontamination practices had resulted in actual harm to innocent third parties who never set foot inside the Anoka Facility.

57.    Following reports of elevated blood lead levels among workers at the Anoka Facility, the MDH launched an investigation into the source of lead exposure affecting workers' family members, including children. The MDH's investigation was specifically triggered by the detection of blood-lead levels in children of Defendants' employees that were inconsistent with other known sources of lead exposure in their environment.

58.    As part of its investigation, the MDH conducted home assessments at the residences of affected workers' families. Those assessments ruled out other potential sources of lead contamination and determined that the lead found in workers' homes — and in the blood of their children — was attributable to contamination originating from the Anoka Facility and carried home by workers on their persons, clothing, shoes, and personal items. These findings directly confirmed that Defendants' failure to implement adequate decontamination measures was the proximate cause of lead poisoning in the surrounding community.

59.    The MDH's home assessments further revealed that lead contamination was present in the vehicles and homes of affected workers, specifically on car floors, on the bottoms of workers' work shoes, and on the floors where workers stored their work shoes upon returning home. These findings established that the take-home exposure pathway was not theoretical — lead had physically traveled from the Anoka Facility into the domestic environments of workers'

18

families, where it was accessible to children who had no connection to Defendants' operations. The MDH's findings thus confirmed that Defendants' failure to implement adequate decontamination measures directly and foreseeably resulted in lead exposure to household members, including minor children.

60.    Defendants' release of lead and hazardous substances into the surrounding Anoka, Minnesota community and the resulting harm to workers' families did not go unnoticed. The MDH's findings, separate Environmental Protection Agency (EPA) enforcement actions, and the broader public health crisis caused by Defendants' failures were widely reported in the media, as evidenced by the following news articles:

   a. *MDH: Elevated lead levels found in four children of Anoka ammunition plant workers*, CBS NEWS, February 10, 2023. Retrieved from: https://www.cbsnews.com/minnesota/news/mdh-elevated-lead-levels-found-in-four-children-of-anoka-ammunition-plant-workers/.

   b. *Anoka ammunition plant's high lead level unnerves neighbors*, FOX 9, March 28, 2024. Retrieved from: https://www.fox9.com/news/anoka-lead-levels-underway-monitored-by-state-officials.

   c. *Anoka ammunition plant will reduce emissions, pay fine under settlement with EPA*, Bring Me The News, September 9, 2024. Retrieved from: https://bringmethenews.com/minnesota-news/anoka-ammunition-plant-will-reduce-emissions-pay-fine-under-settlement-with-epa.

   d. *Anoka ammunition company emitting elevated levels of lead*, MINNPOST, September 19, 2024. Retrieved from: https://www.minnpost.com/health/2024/09/anoka-ammunition-company-emitting-elevated-levels-of-lead/.

## Defendants' Failure to Decontaminate Workers Directly Caused Plaintiff's Lead Exposure

61.    Despite the Defendants having knowledge of the well-documented toxicity of lead, and other hazardous substances, and the multiple instances of these toxicants escaping their facilities and reaching their employees' homes, the Defendants' have failed to fix their faulty decontamination process, audit its effectiveness, and fulfil their obligation to prevent lead dust and other toxicants from escaping their facilities.

19

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM

62.    Plaintiff in this action was exposed to hazardous levels of lead through that same take-home exposure pathway. Specifically, Plaintiff was exposed to lead, lead compounds, and other hazardous substances that were carried out of the Anoka Facility by a worker with whom Plaintiff resided, on that worker's clothing, shoes, skin, hair, and personal items, as a direct and proximate result of Defendants' failure to implement adequate decontamination measures at the Anoka Facility.

63.    Plaintiff's injuries are a direct and proximate result of exposure to excessive levels of lead, lead compounds, cadmium, arsenic, dioxins, sulfur dioxide, and other hazardous substances due to Defendants' deliberate and intentional failure to implement an adequate decontamination process to prevent the escape, dissemination and discharge of lead, lead compounds, and other hazardous substances from disseminating, discharging, and escaping the Facility into the community at large.

64.    Defendants breached their duty by allowing high levels of hazardous substances including, but not limited to, cadmium, lead, lead compounds, dioxins and inorganic arsenic, to escape the Anoka Facility, expose and contaminate Plaintiff and Plaintiff's residence, due to Defendants' intentional failure to implement and exercise required preventive measures.

65.    Despite Defendants' awareness of danger posed to employee family members from hazardous substances dragout, and the need to do required cleaning of work areas, and implement hygiene measures to prevent dissemination of lead, cadmium, arsenic, and sulfur dioxide from the Anoka Facility, and other deficiencies, Defendants prioritized profit-making and continued operations in a way that prioritizes profits over safety, did not provide employees designated personal protective equipment, and failed to operate the Anoka Facility in a manner that would not injure Plaintiff.

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM

66.    Defendants' tortious acts and conduct described herein continued from day to day throughout Plaintiff's residence with an Anoka Facility employee and have not ceased. As a result of Defendants' conscious disregard and indifference to Plaintiff's health and safety, Plaintiff was exposed to dangerously high levels of hazardous substances, including lead, lead compounds, cadmium, arsenic, dioxins and sulfur dioxide and Plaintiff suffered, and continues to suffer, personal injuries.

## CAUSES OF ACTION

### COUNT I - NEGLIGENCE

67.    Plaintiff adopts, realleges, and incorporates all preceding paragraphs as though fully set forth herein, and further alleges the following:

68.    At all times relevant to this claim, Defendants engaged in the business of manufacturing ammunition, in Anoka, Minnesota.

69.    At all times relevant to this claim, Defendants owed a duty to exercise reasonable care for the health and safety of persons and property for which it was reasonably foreseeable could be exposed to lead dust and fragments, lead compounds, cadmium, arsenic, dioxins, sulfur dioxide, and other hazardous substances that emanated from the Facility, including Plaintiff.

70.    At all times relevant to this claim, Defendants owed a duty to Plaintiff to avoid any risks of lead, lead compounds, cadmium, arsenic, dioxins, sulfur dioxide, and/or other hazardous substance exposure.

71.    At all times relevant to this claim, Defendants knew, or in the exercise of reasonable care should have known, that lead, lead compounds, cadmium, arsenic, dioxins, sulfur dioxide, and other hazardous substances from the Facility could, and would, migrate to the residence of Plaintiff and to areas Plaintiff was present at regularly, exposing Plaintiff to lead, cadmium, arsenic, sulfur dioxide, and other hazardous substances.

21

72.    At all times relevant to this claim, Defendants owed a duty to Plaintiff to exercise reasonable care by implementing effective measures to contain lead, cadmium, arsenic, dioxins, sulfur dioxide, and other hazardous substances within the Facility.

73.    At all times relevant to this claim, Defendants knew, or in the exercise of reasonable care should have known, that lead, lead compounds, cadmium, arsenic, dioxins, sulfur dioxide, and other hazardous substances, when inhaled, ingested, or absorbed into the bodies of anyone, were likely to cause or contribute to cause physical damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause significant health diseases, including, but not limited to, learning impairment, speech impairment, memory loss, decreased IQ and mental aptitude, irritability, personality change, hyperactivity, aggression, difficulty sleeping, nausea, vomiting, abdominal pain, constipation, loss of appetite, weight loss, small stature/stunted growth, headaches, lethargy, convulsions, loss of balance, fainting, coma, paralysis, hearing impairment, vision impairment, pain, numbness or tingling in legs, arms, hands and/or feet, muscular weakness, anemia, high blood pressure, heart disease, lung disease, kidney damage, birth defects, and/or cancer.

74.    Plaintiff was exposed to damaging and dangerously elevated levels of lead, cadmium, arsenic, dioxins, sulfur dioxide, and/or other hazardous substances while living with an employee of the Anoka Facility.

75.    A negligence claim has four elements: (1) a duty by Defendant to conform to a certain standard of conduct; (2) a breach by defendant to that duty; (3) a causal connection between the breach and injury to plaintiff; and (4) loss or damage to plaintiff.

76.    In breach of the aforementioned duty of care to Plaintiff, Defendants negligently:

   a.   failed to take strict and effective measures to prevent any release, escape, dissemination or discharge of lead, lead compounds, cadmium, arsenic, sulfur

22

dioxide, and other hazardous substances from the Facility into its Employees homes, vehicles, personal belongings, or the surrounding community;

b.  failed to implement and monitor an effective decontamination process to ensure that its employees were not taking lead home to their family;

c.  failed to take appropriate precautions and exercise the degree of care necessary to avoid the escape of lead, lead compounds, cadmium, arsenic, sulfur dioxide, and other hazardous substances from the Facility; and

d.  failed to implement and supervise the storage, monitoring and disposal of lead, lead compounds, cadmium, arsenic, dioxins, sulfur dioxide, and other hazardous substances.

77.  Defendants carelessly and negligently allowed and permitted the dangerous conditions at the Facility to remain, posing a risk of danger to employee household members. Defendants breached their duty by failing to take sufficiently reasonable precautions and measures to make the facility safe and to prevent the dissemination of lead, lead compounds, cadmium, arsenic, dioxins and sulfur dioxide from the Facility to employee homes and surrounding areas including employee vehicles, the air, surface and groundwaters, Plaintiff's residence and areas at which Plaintiff was regularly present, and Plaintiff's personal property. Defendants were also aware they issued their employees inadequate personal protective equipment and failed to timely provide these for their employees.

78.  It was reasonably foreseeable that Defendants' conduct would harm Plaintiff.

79.  The health conditions suffered by Plaintiff resulting from excessive blood-lead levels and exposure to hazardous substances, including lead, lead compounds, cadmium, arsenic, and sulfur dioxide were a reasonably foreseeable consequence of Plaintiff's exposure to high levels of hazardous substances due to Defendants' negligent operation of the Anoka Facility and lack of

23

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM

effective measures to prevent hazardous substances from leaving the Facility and reaching Plaintiff. Such negligent operation of the Facility and continuous dangerous conditions were a proximate cause of the resulting health conditions suffered by Plaintiff.

80.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered from severe and permanent physical pain, mental anguish, and disabilities, and will continue to do so for the remainder of Plaintiff's life; has suffered the loss of a normal life and will continue to do so for the remainder of Plaintiff's life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff's life.

81.    Through their negligent operation of the Facility, Defendants negligently and wantonly exposed Plaintiff to dangerous levels of hazardous substances, including lead, lead compounds, cadmium, arsenic, dioxins and sulfur dioxide without taking the required and necessary precautions to prevent lead, cadmium, arsenic, and sulfur dioxide from escaping the Facility and exposing Plaintiff. As a result, Defendants caused Plaintiff to suffer from multiple health conditions.

82.    As a direct, foreseeable, and proximate result of the negligent action and non-action of Defendants, Plaintiff suffered bodily injury, resulting in mental and physical pain and suffering, emotional distress, disability, disfigurement, loss of capacity for the enjoyment of life, and medical treatment. The losses are continuous, and Plaintiff will suffer these losses in the future.

83.    WHEREFORE, Plaintiff demands a judgment against Defendants for damages in an amount within jurisdictional limits of the Court, to be determined by a jury, as well as for attorney's fees, costs, interests, and other such relief as this Court deems just and proper.

### COUNT II – MINNESOTA ENVIRONMENTAL RESPONSE AND LIABILITY ACT, MINN. STAT § 115B.05, SUBDIVISION 1(2)

84.    Plaintiff adopts, realleges, and incorporates all preceding paragraphs as though fully set forth herein, and further alleges the following:

24

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM

85.     Pursuant to Minnesota Environmental Responsibility and Liability Act, Minn. Stat. § 115B.05, Subdivision 1(2), any person who is responsible for the release of a hazardous substance from a facility is strictly liable for the following damages which result from the release of to which the release significantly contributes:

"all damages for death, personal injury, or disease including: (i) any medical expenses, rehabilitation costs or burial expenses; (ii) any loss of past or future income, or loss of earning capacity; and (iii) damages for pain and suffering, including physical impairment."

86.     Under the statute, "'Person' means any individual, partnership, association, public or private corporation or other entity including the United States government, any interstate body, the state and any agency, department or political subdivision of the state." Minn. Stat. § 115B.02 Subd. 12.

87.     Under the statute, "'Hazardous substance' means: … (2) any hazardous air pollutant listed pursuant to the Clean Air Act, under United States Code, title 42, section 7412." Minn. Stat. § 115B.02 Subd. 8.

88.     Pursuant to United States Code 42 USC § 7412, Lead Compounds are expressly listed as "hazardous air pollutants."

89.     Pursuant to United States Code 42 USC § 7412, Cadmium Compounds are expressly listed as "hazardous air pollutants."

90.     Pursuant to United States Code 42 USC § 7412, Arsenic Compounds are expressly listed as "hazardous air pollutants."

91.     Pursuant to United States Code 42 USC § 7412, Dioxins are expressly listed as "hazardous air pollutants."

92.     Defendants are persons who operated the Facility within the meaning of Minn. Stat. § 115B.05.

25

Filed in District Court
State of Minnesota
4/20/2026 4:48 PM

93.     Through their operation of the Facility, Defendants released and continue to release lead compounds, cadmium compounds, arsenic compounds, and dioxins into the ambient air.

94.     Through their operation of the Facility, Defendants caused lead and lead compounds, cadmium and cadmium compounds, and arsenic and arsenic compounds, and dioxins to enter the Plaintiff's property and residence, on occasions too numerous to list individually.

95.     Defendants' release of lead and lead compounds, cadmium and cadmium compounds, and arsenic and arsenic compounds, and dioxins caused Plaintiff to suffer personal injuries and diseases, incur in medical and rehabilitation expenses, and experience pain, suffering and physical impairment.

96.     As a result of Defendants' release of hazardous substances into the Plaintiff's residence and into the community where Plaintiff spent a substantial portion of his day-to-day life, Defendants are strictly liable, jointly and severally, for such damages.

97.     WHEREFORE, Plaintiff demands a judgment against Defendants for damages in an amount within jurisdictional limits of the Court, to be determined by a jury, as well as for attorney's fees, costs, interests, and other such relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues raised in this Complaint.

Dated: April 20, 2026.                    Respectfully submitted,

By:     */s/ Michael J. Fuller, Jr.*_____
Michael J. Fuller, Jr., MN Bar No. 506920
Christian Irizarry-Maysonet, *PHV Forthcoming*
**FARRELL & FULLER LAW**
270 Munoz Rivera Ave. Ste. 201
San Juan, PR 00918
T: (939) 293-8244 / F: (939) 293-8245
mike@farrellfuller.com
christian@farrellfuller.com

*Counsel for Plaintiff*

26